## Case No. 7,663.

### KELLOGG v. LA CROSSE, ETC., PACKET CO.

[3 Biss. 496.] [1]

Circuit Court, E. D. Wisconsin. April Term. 1873.

DUTY OF CARRIER—SEAWORTHY VESSEL—DAMAGES—LEAKING OF BARGE.

1. It is the duty of a carrier by water to provide a sea-worthy vessel. A barge for carrying wheat must be tight, strong and sound.

[Cited in The Wilmington, 48 Fed. 569.]

2. The carrier is bound to know the condition and strength of his vessel.

3. The leaking of a barge is notice of her unseaworthiness, and the carrier attempting to proceed on the voyage with her is liable for the loss of the cargo.

This was a libel in personam by James B. Kellogg [against the La Crosse and Minnesota Packet Company] to recover for a cargo of wheat shipped at Winona. Minnesota, by Kellogg & Mann, on board the defendant's barge Victor, to be forwarded to La Crosse, in the state of Wisconsin, on the Mississippi river, in good order, unavoidable dangers of the river and fire excepted. For a valuable consideration, the consignees assigned to the libellant their bill of lading and all claim for damages, by the loss of the cargo. The barge while being towed down the river, by the respondent's steamboat, on the trip to La Crosse, at the point at the head of Dacotah island sank in twenty feet of water, and the cargo of wheat became a total loss.

E. Mariner, for libellant.

John W. Cary, for respondent. cited 1 Phil. Ins. 304; Talcot v. Commercial Ins. Co., 2 Johns. 124; Barnwell v. Church. 1 Caines,

217; Cort v. Delaware Ins. Co. [Case No. 3,257]; 2 Pars. Mar. Law, 138, 139; Walsh v. Washington Mar. Ins. Co., 32 N. Y. 427; The Northern Belle, 9 Wall. [76 U. S.] 526.

MILLER, District Judge. The respondents, in their answer, allege that about eleven o'clock and thirty minutes p. m. of the 16th of April, 1866, the steamer and barge left Winona, the wind blowing strong up stream, but that nothing material occurred until they had reached a point about six miles below Winona, when the wind became stronger and caused the barge to beat heavily against the fenders of the steamboat; that on an examination of the barge then and there made, it was found to have sprung a leak and to be leaking freely, and every possible effort was made by pumping to overcome the leaking, but without avail; that the leak gained and the wind continued to blow strong in the heavy gusts, and in making a crossing necessary to be made, the waves running very high, the barge was swamped at a point near Dacotah island, and barge and cargo became a total loss.

It is in proof that the barge Victor was old, and was originally constructed with knuckles instead of knees, and was open decked; that immediately prior to making this first trip in the spring, she was overhauled by the ship carpenter of the respondent, and put in repair in such places as in his judgment required the substitution of new timbers. On inspection of the barge a portion of the old timbers was found to be in a state of decay. At Homer, six miles below Winona, they put in for wood, when the barge was discovered to be leaking. Two pumps were then and there used, but according to the answer, without effect; and they proceeded down the river, with the water gaining in the barge, as set forth in the answer. The river was running full: the wind fresh, quartering up stream, and the night was very dark.

The barge was fastened to the starboard side of the steamboat with three lines, head line, tow line, and back line, and she had two pumps, one at each end. The master was on watch when they left Winona. He turned in at Homer, while they were wooding; was called out on account of the leaking of the barge. Pumps were applied, when he turned in again, and was at last called out on notice that the barge was sinking.

They stopped at Trempealeau, and a short time after leaving that place, about Richmond, the watchman reported that the barge was making water. Two pumps were started, and two additional ones were put in use, and still the leak gained on them to such an extent that the men left off pumping and had just got off the barge when she rolled over.

The barge being fastened to the starboard side of the steamboat, and the wind blowing

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

up stream, quartering from the Wisconsin shore and they passing from the Minnesota towards the Wisconsin shore, the barge would be partially under the lee of the steamboat, and at the point represented on the map, where the barge sunk, she was entirely under the lee of the steamboat, and off Dacotah island. That point is about twenty-two miles from Winona. Allowing thirty minutes at Homer for wooding, and for the stop at Trempealeau fifteen minutes, they ran from Winona to the island at about the rate of eleven miles an hour.

I think the weight of reliable testimony is, that there was no wind to disturb them until about making the last crossing towards Dacotah island. It is not probable that the master of the steamboat would have turned in, even during his watch, and remained in, with one exception, for a few minutes, until notified that the barge was sinking, if the wind disturbed them.

The wells of the barge had not been examined before departing from Winona. The master of the steamboat was presumed to know, and the respondent or its agents were bound to know, that the Victor was a very old barge, not originally constructed of adequate strength to carry a cargo of wheat in bulk at all stages of water in ordinary conditions of weather.

In addition to this evidence, the leaking of the barge at Homer was sufficient notification to the master of her unseaworthiness. From the leaking at Homer, only six miles on the trip, in the absence of any known cause. unseaworthiness of the barge may be legally presumed.

The barge should have been left. safely moored, at Homer, or returned to Winona for the transfer of the cargo to another barge. It was then demonstrated that the barge was not sufficient for the service.

The supreme court of the United States. in affirming a decree of this court. in the case of The Northern Belle, 9 Wall. [76 U. S.] 526, decides that "it is the duty of a carrier of grain in bulk in barges, on the western rivers, to see that his barge is capable of resisting. without subjecting the barge to injury. all the external forces to which it is subjected in the ordinary course of navigation, including especially those incident to the narrow, crooked and shallow water, and the often changing courses in the currents of the river where they are; and to the force which the large steamers, which have them in tow. are often brought. The barge must be so tight that the water will not reach the cargo; so strong that the outward applications of external force will not spring a leak, or sink her; so sound that she will safely carry the cargo in bulk through the ordinary shocks to which she must every day be subjected. If she is capable of this she is sea-worthy; if she is not, she is unfit for the navigation of the river. It is the duty of the carrier to have his barges often examined and thoroughly inspected, so as to be sure of their condition. For this he is to be held rigidly responsible."

In my opinion the respondent was in fault: First, for loading the barge unfit for the service with 4,574 bushels of wheat in bulk; second, for not examining and inspecting the barge before departing from Winona on her first trip after being repaired; third, for not leaving the barge at Homer, or taking her back to Winona after the leak was discovered, in order that the cargo could be transferred to another barge; fourth, for running on a very dark night at too great rate of speed; fifth, for that the master neglected his duty from Homer to the place of the accident. Decree for the libellant.

As to duty of common carrier to provide a seaworthy vessel. consult Nine Hundred and Twenty-Eight Barrels of Salt [Case No. 10,272]; The Northern Belle [Id. 10,319].

As to duty after accident, consult The Ocean Wave [Id. 10,416].